DJF

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
IMRAN ALI,

                       Plaintiff,

              -against-

SERGEANT DONALD KIPP,

                       Defendant.
------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**11-CV-5297 (NGG) (VMS)**

NICHOLAS G. GARAUFIS, United States District Judge.

Plaintiff Imran Ali brought this action against Sergeant Donald Kipp of the New York City Police Department, asserting claims of excessive force in violation of 42 U.S.C. § 1983. (See Am. Compl. (Dkt. 7); Joint Pre-Trial Order (Dkt. 55); Trial Tr. (Dkts. 93-95) 2:22-3:3, 507:3-5.) A jury trial commenced on May 31, 2016, and on June 3, 2016, the jury returned a verdict finding that Defendant used excessive force against Plaintiff and that the use of excessive force proximately caused injuries to Plaintiff. (Jury Verdict (Dkt. 90).) The jury, however, awarded Plaintiff zero damages. (Id.) Now before the court are Defendant's motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b), and Plaintiff's motion for a new trial pursuant to Rule 59(a). (See Def.'s Mot. for J. as a Matter of Law ("Def.'s Mot.") (Dkt. 97); Pl.'s Mot. for a New Trial ("Pl.'s Mot.") (Dkt. 96).) For the reasons stated below, Defendant's motion is DENIED, Plaintiff's motion is DENIED, and the court AWARDS Plaintiff nominal damages in the amount of $1.

I.    BACKGROUND

On the early morning of July 17, 2009, Plaintiff was involved in a car accident in Queens, New York. (See Trial Tr. 50:20-53:21 (Plaintiff's testimony).) Plaintiff testified that he had been drinking with friends prior to the car accident, and that he was "feeling the effects of the

1

alcohol," but did not believe he was "drunk." (See id. 50:23-51:23, 54:1-11.) The police arrived at the scene shortly after the accident occurred, and arrested Plaintiff for driving while intoxicated. (See id. 54:13-56:10.) He was brought to the 103rd Police Precinct (the "103rd Precinct" or "Precinct"), where Defendant was the acting desk officer. (See id. 56:10-57:20.) Plaintiff testified that he was in an agitated state when he was arrested and taken to the Precinct because the police had not believed him when he told them that he was not the person driving the car when the accident occurred. (See id. 54:12-56:6.) The facts leading up to Plaintiff's arrival at the Precinct are largely undisputed. The central dispute in this case concerns the events that transpired after Plaintiff arrived at the 103rd Precinct. The following sections describe the parties' divergent accounts of the interaction between Plaintiff and Defendant as presented at trial.

A.  Plaintiff's Version

Plaintiff testified to the following series of events. Plaintiff was handcuffed when he was brought before Defendant at the 103rd Precinct. (See id. 57:12-20.) He tried to explain to Defendant that he was not driving, but Defendant refused to listen to him. (See id. 58:3-6.) As a result, Plaintiff became more agitated, and engaged in a heated verbal argument with Defendant at his desk. (See id. 58:3-59:14.) After the verbal confrontation ended, Defendant grabbed him by the neck and pants and dragged him into a holding cell. (See id. 60:2-8.) Defendant used sufficient force to rip Plaintiff's boxers in the process. (See id.) In the cell, Defendant slammed Plaintiff's head into the cell wall several times, then turned him around and slammed his head into the metal bars of the cell gates several more times. (See id. 60:6-62:23.) Plaintiff testified that this assault caused him to be in extreme pain, and that blood started rushing from wounds on his head. (See id. 63:1-8.) Plaintiff recalled that before he fell unconscious from his injuries, Defendant left him in the cell and locked the gates behind him. (See id. 63:10-12.)

2

Plaintiff was taken by an ambulance to Jamaica Hospital, where he received staples and stitches to multiple wounds on his head. (See id. 64:1-19.) Several photographs taken the night after this incident were admitted into evidence at trial, showing blood on Plaintiff's clothes, a wound on the top of his head that was closed by staples, and a cut on the forehead sutured with stitches. (See id. 66:13-68:23; id. 147:3-14 (six staples were applied to Plaintiff's head); see also Ex. B to Pl.'s Mot. (Dkt. 96-3) (Plaintiff's Trial Exhibits 21-B, C, and D).) Plaintiff returned to Jamaica Hospital for follow-up visits relating to his head injuries in the weeks following the incident. (See Trial Tr. 74:10-76:2 (Plaintiff's testimony).) He reported that he was in much pain, including headaches and dizziness, with the frequency of the pain decreasing as time passed. (See id. 75:6-76:2.) Plaintiff sought additional medical care in the months after he sustained his injuries because the headaches and dizziness continued, and he was prescribed over-the-counter pain medication. (See id. 76:9-78:23.) Plaintiff testified that because he was still suffering from headaches and dizziness in the years subsequent to the incident, he sought a consultation with a new neurologist, Dr. Igor Cohen. (See id. 81:17-83:16.) Dr. Cohen examined Plaintiff on numerous occasions, beginning in April 2013, and diagnosed him with post-concussion syndrome, post-traumatic migraine headaches, dizziness, vertigo, and status post head laceration. (See id. 83:17-84:20; id. 167:15-22; id. 394:5-8 (Dr. Cohen's testimony).) Dr. Cohen referred Plaintiff for diagnostic testing, including a magnetic resonance imaging ("MRI") and electroencephalography ("EEG"). (See id. 395:10-396:4 (Dr. Cohen's testimony).) As to Plaintiff's post-concussion syndrome, Dr. Cohen concluded that it was caused by head trauma, and that it was a permanent condition for Plaintiff. (See id. 397:12-19, 399:3-16.) The only treatment for post-concussion syndrome is to manage the symptoms as they occur. (See id. 398:16-24.) At the time of his testimony, Plaintiff stated that he still suffered from headaches

and dizziness once or twice a week, and that he sometimes felt the cuts on his head would split open. (See id. 85:23-86:7 (Plaintiff's testimony).)

Defendant raised numerous issues to impeach Plaintiff's testimony. For example, Defendant's counsel cross-examined Plaintiff as to the degree of his intoxication during the events underlying this trial (see id. 111:5-114:16), and probed various alleged inconsistencies in Plaintiff's testimony (see, e.g., id. 115:12-119:18 (questions relating to the identity of the person allegedly driving Plaintiff's car when the accident occurred); id. 121:3-124:21 (whether Plaintiff was conscious while in the ambulance to Jamaica Hospital); id. 147:3-148:4 (number of staples applied to Plaintiff's head wound)). Defendant also suggested the possibility that part of Plaintiff's claimed injuries—subsequent headaches and dizziness—could have resulted from an unrelated May 2008 car accident during which his head hit the passenger-side window. (See id. 166:2-167:5, 176:5-14.) Plaintiff also accused Police Officer Connick during the ambulance ride to Jamaica Hospital of beating him up, even though Officer Connick was not at the station when the injuries occurred. (See id. 495:10-24 (Police Officer Connick's testimony).) Plaintiff further testified both on direct- and cross-examination that he had several prior brushes with the law. Specifically, Plaintiff testified that he pleaded guilty to a violation of driving while intoxicated relating to the arrest precipitating the events that forms the basis of this case. (See id. 73:1-23 (Plaintiff's testimony).) He explained that he pleaded guilty to the charge, despite having always maintained that he was not driving, because he did not want to risk going to jail. (See id.; see also id. 120:1-16) Plaintiff testified that he pleaded guilty to a felony of attempted burglary in the third degree in 2014. (See id. 87:6-89:1, 106:15-108:15.) Plaintiff was also arrested for driving while intoxicated at another time, but charges were dismissed. (See id. 89:15-25.)

4

Defendant also sought to undermine Dr. Cohen's testimony as to Plaintiff's continuing injuries. Defendant's counsel elicited testimony that Dr. Cohen based his diagnoses on Plaintiff's representations, and did not review any of Plaintiff's prior medical records. (See id. 409:10-410:9 (Dr. Cohen's testimony).) Dr. Cohen also testified that he did not know Plaintiff was involved in a car accident in May 2008—almost a year after the events underlying this case—where his head hit the inside of the car. (See id. 414:11-415:21.) Dr. Cohen noted that, given this information, it is possible that Plaintiff's post-concussion syndrome could have resulted from trauma from the May 2008 car accident. (See id. 415:22-417:16.)

### B. Defendant's Version

Defendant presented a different account of the events that took place in the early morning of July 17, 2009. He denied that he ever slammed Plaintiff's head against the cell wall and gates. (See id. 365:4-13, 366:5-16 (Defendant's testimony).) According to Defendant, Police Officer Sessa brought Plaintiff to the 103rd Precinct, where Defendant was the acting desk officer, at approximately 5:00 a.m. (See id. 216:6-7, 235:11-18, 238:3-5.) Describing the general layout of the Precinct, Defendant stated that the station had a main room approximately 25 to 30 feet long and 15 feet wide, which contained the desk area near the front. (See id. 222:11-228:23.) To the rear is the entrance to a smaller holding room, which was partitioned into an arrest processing area and two holding cells. (See id.) Plaintiff was yelling and screaming when presented to Defendant at the desk area. (See id. 235:19-21.) Defendant testified that Plaintiff was pulling away from Police Officer Sessa, so he walked around the desk area and grabbed hold of Plaintiff to help maintain custody of him. (See id. 245:15-247:5.) Defendant and Police Officer Sessa then patted Plaintiff down for weapons, and walked him four or five steps from the desk area to the entrance to the holding room. (See id. 248:24-25:13.) Police Officer Sessa stopped at the entrance, and Defendant led Plaintiff another four or five steps into the holding room and into

5

one of the holding cells. (See id. 251:1-252:23.) Plaintiff was not walking on his own, so Defendant used some force to physically guide him from the desk area to the holding cell. (See id. 251:16-252:5.) Defendant then forcibly sat Plaintiff down a bench in the cell, and locked the cell and returned to the desk area. (See id. 260:17-25, 261:14-17.) He estimated that this entire process took approximately two minutes. (See id. 255:3-256:6, 262:13-18, 264:11-20.) Plaintiff continued to yell and scream. (See id. 265:21-266:14.)

On his return to the desk area, Defendant encountered Police Officer Sessa, and told Police Officer Sessa that he could return to patrol. (See id. 261:18-262:6.) Back at the desk area, Defendant began logging Plaintiff's arrest. (See id. 266:18-19.) Shortly thereafter, Defendant saw via a video monitor feed into the holding cells that Plaintiff was walking back and forth on top of the bench in his cell. (See id. 267:15-268:22.) Defendant then placed his firearm in the gun locker, and headed to Plaintiff's cell. (See id. 271:5-272:13.) There, Defendant forcibly sat Plaintiff back down on the bench. (See id. 274:21-275:8.) Defendant testified that moments after he returned to the desk area to resume logging the arrest, he heard two hollow banging sounds that Defendant recognized as the sounds of a person's head hitting a wall or floor. (See id. 275:23-279:16.) He looked up at the monitor, and saw Plaintiff seated on the floor with his back against the side wall of the cell, hands still handcuffed behind his back. (See id. 280:1-281:1.) Defendant went to the cell, and saw that Plaintiff was bleeding from his head. (See id. 281:2-4.) He returned to the desk area to call emergency medical services, and then back to the cell to apply pressure on Plaintiff's wounds. (See id. 281:18-285:21.) An ambulance subsequently arrived around 5:15 a.m. to take Plaintiff to a hospital. (See id. 291:15-18.) Defendant called the internal affairs bureau later that day and stated his belief that Plaintiff's head injuries were caused by either falling or otherwise hitting his head on the cell

wall. (See id. 294:8-296:10.) Defendant estimated in his call with internal affairs that the injury occurred at around 5:02 a.m. (See id. 301-14-23.)

Plaintiff challenges Defendant's version of the events by various means. Plaintiff himself denied ever walking on the bench or falling off of it. (See id. 136:9-137:10 (Plaintiff's testimony).) Plaintiff also posited that all the events Defendant described could not have occurred within the two minutes between when Plaintiff arrived at the Precinct at 5:00 a.m., and when Defendant estimated the injury occurred at 5:02 a.m. (See id. 327:8-21 (Defendant's testimony); see also id. 335:11-22.) Plaintiff also elicited testimony and admitted evidence purporting to show inconsistencies in Defendant's account of events. For example, Defendant testified that he and Police Officer Sessa took Plaintiff from the desk area to the holding room and he alone placed Plaintiff in the cell, but Defendant filed an incident report that seemed to indicate that he and Police Officer Sessa placed Plaintiff in the cell together. (See id. 332:19-333:8.) While Police Officer Sessa also testified that Defendant alone took Plaintiff from the entrance of the holding room to the cell, he previously indicated to an internal affairs interviewer that he and Defendant placed Plaintiff in the cell. (See id. 440:12-16, 450:20-451:1 (Police Officer Sessa's testimony).) Plaintiff also pointed to Defendant's interview with internal affairs where he mentioned Police Officer Sessa may still have been at the Precinct when Plaintiff was injured, although both Defendant and Police Officer Sessa testified at trial that Defendant released Police Officer Sessa back to patrol before the injury occurred. (See id. 356:24-359:1 (Defendant's testimony); 442:24-443:4 (Police Officer Sessa's testimony).) Another alleged inconsistency relates to Defendant's trial testimony that he thought the banging sounds he heard from the cell were someone hitting the concrete wall or the floor; he had stated

7

in the internal affairs interview that Plaintiff might have hit his head on the cell gates, which were made of metal. (See id. 359:8-24 (Defendant's testimony).)

C.   Charging Conference and Verdict

At the conclusion of the parties' cases, the court held a charging conference to discuss the verdict sheet and jury instructions. (See id. 506:16-529:2 (charging conference).) Of relevance here, the verdict sheet initially included an option for the jury to award nominal damages in the event that compensatory damages were not proven, and the jury instructions contained a corresponding discussion of nominal damages. Plaintiff objected to its inclusion in a case where Plaintiff's physical injury was uncontested. (See id. 523:5-20.) If the jury found a violation of a constitutional right that proximately caused the injury, then damages must be more than nominal as a matter of law. (See id.) Defendant disagreed, suggesting that there could be some rationale for the jury to find a violation and proximate cause but no compensatory damages. (See id. 523:22-25.) The court noted that "it [would] seem inconsistent if the jury found that he had proved by a preponderance of the evidence that his constitutional rights were violated, which imply that he was injured, and for the injury that we all saw in the photographs, we know that there were definitely costs, damages, of more than a dollar." (See id. 524:1-6.) For this reason, the court agreed to omit any reference to nominal damages in the verdict sheet and the jury instructions. (See id. 524:25-525:1, 526:18-528:19.)

The jury retired to consider its verdict at 12:50 p.m. on June 3, 2016. (Id. 644:5-8.) The jury reached a verdict later that afternoon at 5:38 p.m. (Id. 660:14-18.) It found that "plaintiff [had] proven by a preponderance of the evidence that he was subjected to the use of excess force by Sergeant Kipp." (Jury Verdict (Dkt. 90).) It further found that "plaintiff [had] proven by a preponderance of the evidence that he suffered an injury or injuries that is proximately caused by the use of excessive force." (Id.) However, the jury awarded zero dollars in compensatory

8

damages, and no punitive damages. (Id.) The courtroom deputy polled the jury, and each juror confirmed the verdict. (Trial Tr. 662:8-663:2.) The court thereafter excused the jury. (Id. 663:3-5.)

After the jury exited, Plaintiff's counsel expressed his shock at the jury's verdict of liability and causation and zero damages. (See id. 663:24-25, 664:24-665:1.) The parties then requested leave to file post-trial motions. (Id. 663:23-666:4) The court granted leave and set a briefing schedule for the cross-motions. (Id.) The parties' motions are now pending before the court.

## II. LEGAL STANDARD

### A. Judgment as a Matter of Law

Judgment as a matter of law is appropriate only if the moving party can show that "after full hearing on an issue at trial, 'there is no legally sufficient evidentiary basis for a reasonable jury' to resolve the issue in favor of the non-moving party." Cross v. N.Y.C. Transit Auth., 417 F.3d 241, 247 (2d Cir. 2005) (quoting Fed. R. Civ. P. 50(a)(1)). "[A] court may consider all the record evidence, but in doing so it 'must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence.'" Id. (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)). Where a jury has deliberated and returned a verdict regarding the finding at issue, "[a] movant's burden in securing Rule 50 relief is particularly heavy." Id. at 248. A jury verdict may be set aside only where "there is such a complete absence of the evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture," or there is "such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against him." Id. (citing Song v. Ives Labs., Inc., 957 F.2d 1041, 1046 (2d Cir. 1992)). Put simply, a motion for judgment as a matter of law must be

9

denied unless "there can be but one conclusion as to the verdict that reasonable [persons] could have reached." Id. (citations omitted).

B.     **Motion for a New Trial**

A motion for a new trial pursuant to Federal Rule of Civil Procedure 59(a) is "committed to the sound discretion of the trial judge." Haywood v. Koehler, 885 F. Supp. 624, 625 (S.D.N.Y. 1995) (quoting Fiacco v. City of Rensselaer, 783 F.2d 319, 332 (1986)). While a court may weigh the relevant evidence and order a new trial even if the jury's verdict is supported by substantial evidence, "it is well settled that a trial judge's disagreement with the jury's verdict is not sufficient reason to grant a new trial." Mallis v. Bankers Trust Co., 717 F.2d 683, 691 (2d Cir. 1983) (citations omitted); see also Haywood, 885 F. Supp. at 625-26. A new trial should be granted only if, "in the opinion of the district court, the jury has reached a seriously erroneous result or . . . the verdict is a miscarriage of justice." Song, 957 F.2d at 1047. Furthermore, "[w]here there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way." Atl. & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd., 369 U.S. 355, 364 (1962). Evidence is construed in the light most favorable to the non-moving party. Amato v. City of Saratoga Springs, 170 F.3d 311, 314 (2d Cir. 1999).

## III. DISCUSSION

### A. Defendant's Motion for Judgment as a Matter of Law[1]

Defendant does not and cannot meet his burden for a judgment as a matter of law. Defendant's primary argument is that the jury's failure to award any damages effectively nullifies their liability findings that (1) Defendant subjected Plaintiff to the use of excessive force, and (2) Plaintiff suffered an injury or injuries proximately caused by Defendant's use of excessive force. (Mem. of Law in Supp. of Def.'s Mot. (Dkt. 100) at 4; see also Jury Verdict.) However, Defendant makes no effort to satisfy the legal standard for the Rule 50 relief he seeks, namely, that there is a complete absence of evidence supporting liability against Defendant, or there was overwhelming evidence that he did not use excessive force against Plaintiff and/or that Plaintiff did not suffer any injury proximately caused by the alleged use of excessive force. Cross, 417 F.3d at 247. The parties submitted to the jury competing versions of what happened on the early morning of July 17, 2009. Plaintiff testified that Defendant slammed his head into the cell wall and gates. Defendant denied Plaintiff's version of the events, and instead testified that Plaintiff either intentionally or accidentally injured himself. Plaintiff also presented circumstantial evidence that sought to contradict Defendant's testimony. The jury's verdict on liability rested on their assessment of who was more credible. Upon deliberation, the jury decided that Defendant did use excessive force, and that Plaintiff suffered injuries proximately caused by Defendant. Drawing all reasonable inferences in favor of Plaintiff, the non-moving party here, the jury's liability verdict against Defendant is supported by Plaintiff's testimony and

---

[1] Defendant moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a) after Plaintiff rested his case, and also after Defendant rested. (Trial Tr. 499:1-501:8, 503:1-15.) The court denied Defendant's motions on the record. (See id.) Because he moved for judgment as a matter of law prior to the submission of the case to the jury, Defendant is entitled to renew his motion pursuant to Rule 50(b) post-verdict. See Fed. R. Civ. P. 50; Stoma v. Miller Marine Servs., 271 F. Supp. 2d 429, 430 (E.D.N.Y. 2003).

11

other evidence in his case-in-chief. It also cannot be said that Defendant presented such overwhelming evidence that no fair-minded or reasonable jury could arrive at a verdict against him. Accordingly, Defendant's motion for judgment as a matter of law is denied.

## B. Plaintiff's Motion for a New Trial

Plaintiff argues that "[t]he jury's finding of zero damages is contrary to the evidence that Ali suffered severe head injuries that required six staples and at least four sti[t]ches at the hands of Kipp." (Mem. of Law in Supp. of Pl.'s Mot. ("Pl.'s Mem.") (Dkt. 96-13) at 2.) Plaintiff asserts that because the jury found these injuries were proximately caused by Defendant's use of excessive force, compensatory damages were required as a matter of law. (Id. at 2-3 (citing Wheatley v. Beetar, 637 F.2d 863, 866-67 (2d Cir. 1980) ("A beating severe enough to leave marks is sufficient proof of a compensable injury.")).) Defendant responds that Plaintiff's motion is a veiled attack against the inconsistency of the jury verdict—liability and proximate cause, but no damages—but Plaintiff waived his objection on consistency grounds when he failed to raise it before the jury was discharged. (Mem. in Opp'n to Pl.'s Mot. ("Def.'s Opp'n") (Dkt. 102-4) at 3-4.) If the court finds that the objection was not waived, then Defendant proposes nominal damages not to exceed $1 be awarded to Plaintiff. (Id. at 5-7.) Plaintiff counters that Defendant's waiver argument is inapposite because the jury verdict is consistent. (Mem. in Further Supp. of Pl.'s Mot. ("Pl.'s Reply") (Dkt. 103) at 2-3.) Plaintiff reconciles any seeming inconsistency by assuming some form of jury misconduct occurred: "either a repudiation of Ali's character—the jury simply did not like him due to his conduct and criminal record—or an impermissible compromise [amongst the jurors to resolve their inability to reach a

12

unanimous verdict on liability by awarding inadequate damages]." (Id. at 3.)[2] As explained in greater detail below, the court concludes that all of the jury's findings are consistent, including its award of no compensatory damages. However, because the jury found a substantive constitutional violation, an award of nominal damages is required.

1. Consistency of Jury Verdict

A threshold issue for the court is whether the jury's answers on the verdict sheet are consistent. In evaluating a jury's answers, the court "must adopt a view of the case, if there is one, that resolves any seeming inconsistency." Brooks v. Brattleboro Mem'l Hosp., 958 F.2d 525, 529 (2d Cir. 1992) (citation and internal quotation marks omitted). Only where the answers are "ineluctably inconsistent" should a valid jury verdict be set aside, and a new trial ordered. Munafo v. Metro. Transp. Auth., 381 F.3d 99, 105 (2d Cir. 2004) (quoting Tolbert v. Queens Coll., 242 F.3d 58, 74 (2d Cir. 2001)). This is because the Seventh Amendment mandates that "no fact tried by a jury[] shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law." U.S. Const. amend. VII. A ruling that invalidates or otherwise ignores any of a jury's finding thus "results in a collision with the Seventh Amendment." Atl. & Gulf Stevedores, Inc., 369 U.S. at 364. Inconsistent answers on a verdict sheet "raise constitutional concerns because 'proper deference to the parties' Seventh Amendment rights to trial by jury precludes entry of a judgment that disregards any material jury finding.'" Munafo, 381 F.3d at 105 (quoting Tolbert, 242 F.3d at 74). Upon a closer

---

[2] While Plaintiff argues that Defendant used evidence of his level of intoxication and prior criminal history to poison Plaintiff in minds of the jurors, he does not contest the admissibility of the evidence. Thus, the court will only reiterate that Plaintiff's intoxication was probative of his memory and perception of the events on the day in question and relevant to Defendant's theory that Plaintiff fell off the bench on his own. (May 23, 2016, Mem. & Order (Dkt. 75) at 6-10.) Evidence of Plaintiff's prior criminal history was probative of his credibility as a witness. (May 31, 2016, Mem. & Order (Dkt. 84) at 4-7.)

examination of the evidence adduced at trial, the court concludes that there is a view of the case that harmonizes the jury's answers.

The jury found that: (1) Plaintiff proved that "he was subjected to the use of excessive force by Sergeant Kipp"; (2) Plaintiff proved that "he suffered an injury or injuries that is proximately caused by the use of excessive force"; and (3) Plaintiff is entitled to zero dollars in damages. (Jury Verdict.) Plaintiff interprets these findings to mean that the jury believed Plaintiff's version of the events on the morning of July 19, 2007, i.e., Defendant slammed Plaintiff's head into the cell wall and gates, and this use of excessive force proximately caused Plaintiff's head injuries. If this were the only conclusion from the jury's findings, then the court would be inclined to agree that a new trial is necessary. It is axiomatic that "a beating severe enough to leave marks is sufficient proof of a compensable injury." Atkins v. New York City, 143 F.3d 100, 104 (2d Cir. 1998) (citing Wheatley, 637 F.2d at 866-67). Plaintiff's argument is flawed for two reasons, however, and thus a new trial is not needed.

First, Plaintiff's contention that the jury found Defendant physically assaulted Plaintiff in the holding cell, leading to the lacerations on his head that needed to be closed by staples and stitches, is inconsistent with the third jury finding of no damages. The court rejects Plaintiff's argument that such an inconsistency can be rationalized away simply by speculating that the award of zero damages was the result of some impermissible jury conduct—either the jurors refused to award Plaintiff damages because they disliked him, or the damages award was the result of a compromise verdict. (See Pl.'s Reply at 3.) Plaintiff cites no law—and the court finds none—for the proposition that speculation of jury misconduct allows a court to ignore logical inconsistencies in its findings. The court's task in resolving seemingly inconsistent jury answers is to determine whether there is a factual scenario supported by the record evidence that

explains all of the findings, not whether there could have been some impermissible ulterior motive for the jury to answer the way it did the questions on the verdict sheet. See, e.g., Amato, 170 F.3d at 314-15; Crockett v. Long Island R.R., 65 F.3d 274, 278 (2d Cir. 1995).[3]

Second, the court is not persuaded that the only view of the case based on the jury's verdict is that Defendant assaulted Plaintiff in the holding cell. Even a cursory review of the evidence reveals that this is a quintessential "he said, he said" dispute. Plaintiff argues that Defendant forcefully dragged him from the desk area to the holding cell of the 103rd Police Precinct, where Defendant proceeded to physically assault him. Defendant argues that while he used some force to guide Plaintiff to his holding cell, no assault as described by Plaintiff occurred in the cell. Defendant posits that Plaintiff fell off the bench in the holding cell because he was drunk and through no fault of Defendant. The parties do not dispute that Plaintiff suffered multiple lacerations on his head, one of which required staples and the other stitches. The only dispute is the cause, and no one other than Plaintiff and Defendant witnessed Plaintiff injure his head. The court readily acknowledges that it had expected the jury to weigh the evidence and assess the witnesses' credibility, and pick one version of the events over the other. (See Trial Tr. 524:25-525:1, 526:18-528:19 (noting that "it [would] seem inconsistent if the jury found that he had proved by a preponderance of the evidence that his constitutional rights were violated, which imply that he was injured, and for the injury that we all saw in the photographs, we know that there were definitely costs, damages, of more than a dollar").)

However, a deeper analysis of the evidence and the jury's answers in the verdict sheet indicates a third possibility. The questions the jury answered are not sufficiently specific that the

---

[3] Moreover, if an inconsistency can be explained away simply by hypothesizing an error in a jury's reasoning, it is difficult to imagine how a jury verdict can ever be inconsistent.

15

court can divine the jury's thoughts as to what conduct constituted use of excessive force, or what harm was caused by that excessive force. The parties presented competing theories on what happened in the holding cell on the early morning of July 17, 2009, and "the jury was entitled to believe parts and disbelieve parts of the[ir] testimon[ies]." Fiacco, 783 F.2d at 325. The parties vigorously challenged by various means the credibility of the other side's trial witnesses. The jury could have decided that various portions of each party's version of the events was believable, and weaved them together to form a unified account of what occurred.

A reasonable jury could have credited Plaintiff's testimony that Defendant grabbed him by the neck and pants and dragged him to the holding cell, ripping his boxers in the process, and concluded that the amount of force used was excessive, i.e., it was more than that necessary to bring to a holding cell a 115-pound individual handcuffed behind his back. (See Jury Instructions (Dkt. 91-4) at 12 (defining excessive force as more than the reasonable force necessary under the circumstances).) Defendant himself admitted that he had to use some physical force to take Plaintiff to the cell because he was not wholly cooperative. However, the jury could have disbelieved Plaintiff's testimony that Defendant slammed his head into the cell wall and gates, and instead believed Defendant's testimony that Plaintiff was alone and pacing back and forth on the bench in his cell when the head injuries occurred. This view of the case provides as a rational basis for the jury's answers. When the jury found that Defendant used excessive force, it meant the force used to place Plaintiff in the cell. When the jury found that Defendant's use of excessive force proximately caused injuries to Plaintiff, it meant some pain as a result of the grabbing and dragging and <u>not</u> the head injuries that neither party contests Plaintiff suffered. As the Second Circuit has explained, "a jury finding of excessive force does not automatically entitle a claimant to compensatory damages as a matter of law [if] the injuries lack

monetary value." Amato, 170 F.3d at 314. Even conduct that caused some physical pain and resulted in side effects need not be compensated if a jury finds that such injuries were de minimis. Kerman v. City of New York, 374 F.3d 93, 123 (2d Cir. 2004) (finding compensatory damages not necessary where plaintiff alleged he suffered pain in his hands and subsequent soreness in his back and neck). The jury could have concluded that while Plaintiff proved he was subjected to excessive force and that he was harmed as a result, what injury he suffered was de minimis and lacked monetary value. Toliver v. N.Y.C. Dep't of Corr., — F. Supp. 3d —, No. 10-CV-822 (RJS), 2016 WL 4705166, at *4 (S.D.N.Y. July 29, 2016) (reasoning that the jury could have found that a defendant used excessive force when he pepper sprayed plaintiff's face but that plaintiff did not suffer a compensable injury).

The court concludes its analysis where it began: a verdict should be overturned and set aside only if there is no view of the case that can harmonize the jury's findings. Tolbert, 242 F.3d at 74. In other words, it is not enough to show that the jury's answers on a verdict sheet did not conform to the theories the parties advanced or that the court would have anticipated. While the view of the case outlined above—Defendant only used excessive force against Plaintiff while escorting him to the holding cell, and Plaintiff suffered only de minimis injuries as a result—is not the most intuitive, it is nonetheless supported by the evidence and serves as a rational explanation of the jury's seemingly incongruous findings. Because the court rejects Plaintiff's interpretation of the jury verdict that the uncontested head wounds Plaintiff suffered were the result of Defendant's alleged assault in the holding cell, Plaintiff's motion for a new trial premised upon this interpretation is denied.

### 2. Propriety of Nominal Damages

Although the court concludes that Plaintiff is not entitled to a new trial because he was not entitled to compensatory damages as a matter of law, Plaintiff nevertheless is entitled to

17

nominal damages. "[A]n award of nominal damages is not discretionary where a substantive constitutional right has been violated . . . ." Gibeau v. Nellis, 18 F.3d 107, 110-11 (2d Cir. 1994); see also Atkins, 143 F.3d at 104. Because the court did not anticipate a theory of the case where a reasonable jury could find that Defendant used excessive force against Plaintiff but failed to prove a compensable injury, it failed to instruct the jury on nominal damages. The appropriate remedy for this error "is for the court itself to enter judgment awarding the claimant nominal damages." See Robinson v. Cattaraugus County, 147 F.3d 153, 162 (2d Cir. 1998). To the extent that Defendant argues Plaintiff waived nominal damages by failing to object to its exclusion from the jury instructions and the verdict form (indeed, Plaintiff proposed deleting any mention of nominal damages), waiver is inapplicable here because it was plain error not to instruct on nominal damages in light of the existence of a theory of the case where a constitutional violation is found but no compensable injury. See Gibeau, 18 F.3d at 110-11. Accordingly, the court concludes that Plaintiff is entitled to nominal damages as a matter of law.

## IV. CONCLUSION

For the foregoing reasons, Defendant's motion for judgment as a matter of law is DENIED, and Plaintiff's motion for a new trial is DENIED. The court AWARDS Plaintiff nominal damages in the amount of $1.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
December 12, 2016

NICHOLAS G. GARAUFIS
United States District Judge